# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:14-CV-00122-MR-DLH

MICHAEL A. KITCHEN )
LISA CHARLENE HONEYCUTT, )
                  )
       Plaintiffs, )
                  )
    vs. )
                  )
SHAWN MILLER, JASON PAGE, CHAD )   <u>MEMORANDUM OF</u>
FARMER, AARON WHITMIRE, GREG )   <u>DECISION AND ORDER</u>
HOLDEN, BARRY GALLOWAY, PHIL )
HARRIS, CITY OF BREVARD N.C., )
DAVID MAHONEY, TRANSYLVANIA )
COUNTY N.C., )
                  )
       Defendants. )

**THIS MATTER** is before the Court on the Defendants' Motion to Dismiss for Failure to Prosecute [Doc. 60] and Motion for Summary Judgment [Doc. 67].

## I. PROCEDURAL BACKGROUND

The Plaintiffs, Michael A. Kitchen and Lisa Charlene Honeycutt ("Plaintiffs"), along with Natasha Sinclair, brought this action on May 14, 2014. [Doc. 1]. Six days later they filed a First Amended Complaint, wherein all claims of Plaintiff Sinclair were dropped. [Doc. 2]. The Defendants responded by filing a Motion to Dismiss. [Doc. 5]. With the consent of the

Defendants, the Plaintiffs amended their Complaint a second time and filed their Second Amended Complaint (hereinafter "Complaint") on August 20, 2014. [Doc. 12].

There are eight claims for relief in the Complaint. In Counts One, Three, Four, Five, and Six, Plaintiffs assert Section 1983 claims against certain Defendants for their participation in the events of May 14, 2011 and the events leading up to and following that date. Those claims include unlawful arrest, use of excessive force, deprivation of property without due process, and failure to intervene to protect Plaintiffs. In Counts Two and Three Plaintiffs assert supervisory liability pursuant to Section 1983 against Defendant Harris, the Chief of Police of the Brevard Police Department; Defendant Mahoney, the Sheriff of Transylvania County; Transylvania County; and the City of Brevard, North Carolina. In these claims Plaintiffs assert a failure to train, supervise, and implement appropriate policies. In Counts Seven and Eight Plaintiffs assert North Carolina common law claims against certain Defendants for assault and battery and intentional infliction of emotional distress. [Doc. 12].

On September 4, 2014, the Defendants again moved to dismiss on the basis that some claims were time-barred, and others were duplicative and should be dismissed. [Doc. 16]. Pursuant to 28 U.S.C. § 636(b) and the

Standing Orders of Designation of this Court, the Defendants' Motion to Dismiss was referred to the Honorable Dennis L. Howell, United States Magistrate Judge, who recommended that the Motion to Dismiss be granted in part and denied in part. [Doc. 33]. On May 14, 2015, the Plaintiffs timely objected to some, but not all, of the Magistrate's recommendations [Doc. 37], and on May 26, 2015, the Defendants replied thereto. [Doc. 39].

On September 22, 2015, this Court entered an Order dismissing all of the Plaintiffs' claims predicated upon conduct occurring *before* May 14, 2011, all of the Plaintiffs' claims predicated upon conduct occurring *after* May 14, 2011, and all of the Plaintiffs' claims against Defendants Woodson, Sizemore, H. Holden, Barton, Thompson, and John Does #5-#20. [Doc. 40]. This Court subsequently dismissed John Does #1-#4 due to the Plaintiff's failure to serve process on them pursuant to Rule 4(m) of the Federal Rules of Civil Procedure. [Doc. 46].

Accordingly, the remaining Defendants are: Transylvania County, Sheriff Mahoney, the City of Brevard, Chief Harris, and City of Brevard police officers Shawn Miller, Jason Page, Chad Farmer, Aaron Whitmire, Greg Holden, and Barry Galloway. The only remaining allegations against these Defendants arise from the events alleged to have occurred on May 14, 2011. Against the individually-named police officers, Plaintiffs' claims include false

arrest, excessive force, assault and battery, and infliction of emotional distress. The Plaintiffs also allege failure-to-train claims against the County, the City, the Sheriff, and the Chief of Police.

On October 6, 2015, the Defendants' filed their Answer and Counterclaims. [Doc. 41]. On November 5, 2015, the Plaintiffs replied to the Counterclaims. [Doc. 44]. On May 11, 2016, the Plaintiff's attorney moved to withdraw [Doc. 51], which motion was allowed on June 27, 2016.[1] [Doc. 59]. The following day, the Defendants filed a Motion to Dismiss the case for lack of prosecution [Doc. 60], a Motion to Compel responses to discovery requests [Doc. 62], and a Motion to Reopen Discovery [Doc. 65]. The Plaintiffs have not filed a response to any of these motions.

On July 1, 2016, the Defendants filed a Motion for Summary Judgment. [Doc. 67]. On July 7, 2016, the Plaintiffs were provided notice, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), of the burden they face

---

[1] At the hearing on the Motion to Withdraw, Plaintiff Honeycutt appeared with her sister, Sheila Alexander. A document was tendered to the Court showing that Ms. Alexander had been appointed guardian of the person of Plaintiff Honeycutt by the Transylvania County Clerk of Superior Court. A copy of this document was filed in the docket of this case. [Doc. 57]. This document reflects, however, that Ms. Alexander "has no authority to receive, manage, or administer the property, estate or business affairs of the ward [Plaintiff Honeycutt]." All further communications by this Court with Plaintiff Honeycutt have been through her guardian, Ms. Alexander, as well as to Plaintiff Honeycutt's last known address, and all certificates of service in this matter since that date reflect service upon Plaintiff Honeycutt c/o Ms. Alexander as guardian.

in opposing a motion for summary judgment, and that their responses were due no later than August 5, 2016.  [Doc. 69].  On July 12, 2016, the Magistrate Judge denied the Defendants' motions to compel and to reopen discovery.  [Docs. 71, 72].  The Plaintiffs did not respond to the Defendants' Motion for Summary Judgment on or before August 5, 2016.  The Plaintiffs also have not responded to the Defendants' Motion to Dismiss for Lack of Prosecution.  On December 9, 2016, this Court held a hearing on the Defendant's Motion for Summary Judgment.  The Plaintiffs were provided due notice of the hearing but did not appear either *pro se* or through counsel.[2] Accordingly, these motions are unopposed and now ripe for disposition.

## II.    STANDARD OF REVIEW[3]

Under the Federal Rules of Civil Procedure, summary judgment is proper, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  A party seeking summary judgment must present a forecast of evidence that, if believed by a jury, would support judgment in

---

[2] Since Plaintiffs' original counsel was allowed to withdraw on June 27, 2016, no substitute counsel has appeared for the Plaintiffs.

[3] Because the Defendants' Motion for Summary Judgment fully disposes of this proceeding, the Defendants' Motion to Dismiss for Lack of Prosecution is moot.  Thus, the standard of review for that Motion is omitted.

favor of the movant.  See Custer v. Pan American Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993).  Where, as here, the Plaintiffs do not file a response to Defendants' Motion for Summary Judgment, the facts established by the Defendant's Motion are treated as undisputed.  See Id.

## III.   UNDISPUTED FACTS

The following is a summary of the relevant portions of the Defendants' undisputed forecast of evidence.  Shortly after 5 p.m. on May 14, 2011, the Brevard Police Department dispatched units to the Mountain Glen apartments on a report that the Plaintiff, Michael Kitchen, was in a common area of the complex kicking boxes and acting very strangely.  Defendants Greg Holden and Chad Farmer, police officers for the City of Brevard, responded to the call.  Upon arrival, the officers observed Kitchen, who, upon seeing the officers, quickly turned and entered his apartment.  The officers knocked on the apartment door, and it was opened by Kitchen's aunt, Plaintiff Charlene Honeycutt.  The officers explained what the caller had reported, but Honeycutt denied the allegations.  As the officers walked away to contact the caller, Honeycutt yelled obscenities at them.  [Doc. 67-1 at ¶ 2].

At the caller's apartment, the officers spoke to two female adults who described how Kitchen tore apart boxes in the yard outside the apartment while jumping up and down on them and mumbling unintelligibly.  The

females went on to describe other bizarre behavior, such as Kitchen walking around the complex carrying an axe and peering into apartment windows. The callers were asked to write statements. While waiting for these statements to be written, the officers spotted Mark Hughes, a local resident who the officers knew had outstanding arrest warrants. Defendant Holden arrested Hughes and transported him to the county detention center, leaving Officer Farmer by himself at the apartment complex. Defendant Holden was not present for the events that subsequently unfolded between the Plaintiffs and officers. [Id. at ¶ 3].

After Holden left, Farmer ran a records check on Kitchen and confirmed that there were two outstanding warrants for Kitchen's arrest, one for stalking and one for disorderly conduct. [Doc. 67-4 at ¶¶ 3-4]. The warrants showed up as active in the NCAWARE database accessible from Farmer's patrol car's computer. Based on Farmer's prior awareness of Kitchen's reputation for strange behavior, he requested that additional officers respond to the scene. [Doc. 67-1 at ¶ 4].

At around 5:50 p.m., Defendant Brevard police officers Shawn Miller, Jason Page, and Aaron Whitmire, arrived on the scene. All officers on scene were attired in full police uniform. After Farmer briefed the other officers on the underlying call and the active arrest warrants, it was decided that they

would undertake to effectuate the arrest by Farmer, Miller, and Page would go to the front door of Kitchen's ground floor apartment, and that Whitmire would go to the side of Kitchen's building where a bedroom window was located.  [Id. at ¶ 5].  Miller knocked on the front door several times while loudly announcing "Police" before Honeycutt finally opened it.  Kitchen was seen looking at the officers from an interior hallway.  When Miller announced they were there because of arrest warrants for Kitchen, Honeycutt tried closing the door, but Miller stopped it from closing with his foot.  Miller then pushed the door open and the three officers entered the apartment.  [Id. at ¶¶ 6-7].  As soon as they entered, Honeycutt tried pushing Miller back towards the door.  Miller ignored her and stepped towards Kitchen, who was facing the officers with his left hand concealed behind his back.  [Id. at ¶ 7].

Miller and Farmer ordered Kitchen to show his hands.  When Kitchen continued to conceal his left hand, Miller reached out and used an arm bar control hold to take him down onto the carpeted floor.  Once on the floor Kitchen physically resisted by putting both arms underneath his chest.  Miller immediately lay across Kitchen's back while Farmer and Page tried pulling his arms free for handcuffing.  Despite these efforts by three officers, Kitchen managed to push himself up as though trying to break free.  During this entire time all three officers were ordering Kitchen to stop resisting and place his

hands behind his back. Kitchen ignored the commands and began yelling that he was God. [Doc. 67-1 at ¶ 7].

At this point Honeycutt moved forward and began striking all three officers on their backs with her fist or fists. This caused Page to disengage from Kitchen and grab Honeycutt and move her off to the side towards a couch. [Id. at ¶ 8]. Officer Whitmire entered the apartment about this time and handcuffed Honeycutt and sat her down on the floor. [Doc. 67-3 at ¶ 4]. Undeterred, Honeycutt stood back up and approached the other officers and began kicking them, until Whitmire stopped her and moved her out of the way. [Id. at ¶¶ 4-5].

Meanwhile, Kitchen's hands remained unsecured and he continued physically resisting, including kicking at the officers. After Miller delivered a quick burst of pepper spray to Kitchen's face, he and Page were able to start controlling Kitchen's arms. [Doc. 67-1 at ¶ 9]. As Farmer was pulling out his handcuffs, Natasha Sinclair emerged from a bedroom down the hall and approached the officers holding a cup or container. Farmer commanded her to stop, and when she refused his command Farmer fired his TASER at her. Farmer apparently missed, and Sinclair continued her advance. [Id.]. That was the only use of a TASER inside the apartment. [Doc. 67-2 at ¶ 7]. Suddenly, Sinclair threw the liquid contents of the cup or container towards

the officers, striking all three of them and Kitchen. The liquid had a chemical smell, and upon contact with the skin, it burned. Sinclair then tossed the remaining liquid onto the hallway carpet with a backhand motion before retreating into the bedroom. [Doc. 67-1 at ¶ 10]. Around that time, Miller recalls Kitchen yelling, "Don't tase me; she poured gas on me. If you tase me or shoot me we'll all goddamn burn." [Doc. 67-2 at ¶ 7]. Moments later Sinclair appeared again, this time with a burning cotton ball, which she proceeded to throw at them. The cotton ball landed on the carpet and started a fire the size of a basketball, which Farmer quickly extinguished with his boot. Farmer chased after Sinclair, but she locked herself inside the bedroom before he reached the door. [Doc. 67-1 at ¶ 11]. Upon returning to the living room Farmer saw that Miller and Page were still struggling with Kitchen so Farmer helped to pin Kitchen against the wall. [Id. at ¶ 12].

Before the officers could get Kitchen fully controlled and handcuffed, Sinclair appeared again, this time holding a lighter, which she held down to the carpet where she had first tossed the caustic liquid. The carpet ignited immediately, and the fire quickly spread along the trail of liquid stretching down the hallway to the living room. Sinclair then ran back into the bedroom, and smoke began escaping from underneath the door. [Id.]. Things then

became even more chaotic, as Kitchen broke free and joined Sinclair in the bedroom and barricaded the door.  [Id. at ¶ 13].

Whitmire heard someone yell "Fire," and Miller telling him to get Honeycutt out of the apartment.  When Whitmire tried walking Honeycutt out she resisted, so he grabbed her by the arms and pulled her backwards out the door and onto the grass with her feet dragging on the ground.  [Doc. 67-3 at ¶ 5].  After this fire was reported, Defendant Barry Galloway, also a City of Brevard police officer, arrived at the Plaintiffs' apartment complex.  [Doc. 67-1 at ¶ 16].  Defendant Galloway merely stayed with Honeycutt until she was transported to the Transylvania County Detention Center by Transylvania County Sheriff's Sergeant Chris Hawkins.  [Docs. 67-1 at ¶ 16; 67-2 at ¶ 12].

Meanwhile, Farmer ran to his patrol car in the parking lot, radioed for the fire department, and grabbed a fire extinguisher out of the trunk.  Farmer handed the extinguisher to Page and returned with him to the apartment to spray the flames, but Miller told him to go to the bedroom window instead. Farmer forced the window open and was met with heavy black smoke.  He reached inside and felt someone, who turned out to be Kitchen, and pulled him out through the window.  Kitchen immediately stumbled away as though trying to flee.  [Id. at ¶ 13].

Farmer ignored Kitchen and climbed through the window into the bedroom.  He reached for Sinclair through the smoke and yelled for her to grab his hand.  When she said something about it all being a "conspiracy" and that she was not leaving, Farmer grabbed Sinclair's arm and forcefully pulled her out.  Once on the grass Sinclair became very combative and hit and kicked Farmer as he tried to handcuff her.  Page arrived to help and grabbed a pink lighter out of Sinclair's hand that she was trying to strike.  With the assistance of two other officers, Farmer was able to place Sinclair in handcuffs.  [Id. at ¶ 14].

Officers Page and Whitmire then confronted Kitchen and ordered him to the ground.  Kitchen refused, stating he was God and telling the officers they could not hurt him.  When Kitchen assumed a fighting stance with clenched fists, Page sprayed him in the face with pepper spray.  The canister emptied after only a single three to five second burst.  Whitmire then deployed his own pepper spray canister and sprayed Kitchen's face, but Kitchen still would not get on the ground.  Instead, Kitchen began running towards the parking lot.  When Kitchen reached the lot he stopped, and Whitmire again told him to get on the ground.  In response, Kitchen pointed his finger at Whitmire and said "Fuck You." [Doc. 67-3 at ¶ 6].

Whitmire proceeded to grab Kitchen's upper torso and physically pushed him to the ground.  As the two men struggled, Whitmire on Kitchen's back, Kitchen began hitting Whitmire in the torso with elbow strikes.  After Whitmire finally got control of Kitchen's hands, Kitchen scratched Whitmire's right forearm, breaking the skin, and also bit him.  After an estimated 1.5 to 2 minute struggle between Kitchen and Whitmire, Page joined the fray and Kitchen began attempting to kick both officers.  At that time, Alcohol Law Enforcement ("ALE") Agent David Miller[4] intervened and deployed his TASER on Kitchen's back in stun mode.  Whitmire and Page handcuffed Kitchen, affixed leg restraints, and placed Kitchen into the back seat of Whitmire's patrol car.  [Id. at ¶ 7].

Whitmire proceeded to transport Kitchen to the Transylvania County Detention Center.  Upon leaving the apartment parking lot, Whitmire instructed dispatch to notify the county detention center that he was bringing in a combative subject who had been shackled and handcuffed.  Whitmire drove straight to the detention center.  Contrary to Kitchen's allegations, Whitmire did not raise the windows and turn on the heat, he did not take tight turns, and he did not drive recklessly.  [Id. at ¶ 8].

---

[4] David Miller is not a named Defendant in this matter.

Upon arrival at the detention center at about 6:30 p.m., Whitmire parked in the parking lot and was met by three deputies or detention officers. Each of them took an arm or a leg, and they carried Kitchen a short distance into the jail by way of the open sally port. Once Kitchen was placed on his stomach inside a holding cell, he announced that he was from the "twelve tribes of Judah" and that he stood for "the Muslim world and Aryan race."

Kitchen was later charged with three counts of resist/delay/obstruct and one count of assaulting an officer. Following a bench trial in state district court on January 24, 2012, Kitchen was found guilty of "failing to place his hands behind his back and follow verbal commands for arrest," and failing "to follow Officer Whitmire's command to get on the ground and being told to stop resisting arrest and lie flat on the ground." [Doc. 67-2 at ¶ 13 (quoting Magistrate's Order in Case No. 11CR050932)].

Honeycutt was also charged with one count of resist/delay/obstruct for "failing to follow verbal commands to open the door and move out of the way" during the effort to arrest Kitchen "on outstanding warrants." [Id. at ¶ 14 (quoting Magistrate's Order in Case No. 11CR050933)]. Those charges were dismissed on August 23, 2011, the District Attorney noting: *"Δ mentally handicapped. Couldn't form mens rea to resist."* [Id.].

Based upon the undisputed facts above, this Court makes the following conclusions of law.

## IV.   DISCUSSION

The Plaintiffs allege that the individual Defendant police officers, Shawn Miller, Jason Page, Chad Farmer, Aaron Whitmire, Greg Holden, and Barry Galloway, acted unlawfully in connection with the Plaintiffs' arrests on May 14, 2011, constituting false arrest, false imprisonment, excessive force, and deprivation of property in violation of Section 1983, as well as assault and battery and negligent or intentional infliction of emotional distress in violation of North Carolina common law.   The Plaintiffs assert that the City of Brevard and Chief Harris are liable, pursuant to Section 1983, for failing to properly train the officers involved in those arrests.   Finally, Plaintiff Kitchen asserts that Transylvania County and Sheriff Mahoney are liable, pursuant to Section 1983, for failing to properly train the unnamed officers involved in carrying Kitchen into the Transylvania County Detention Center.

### A.   All Claims Against Defendants Holden and Galloway

As an initial matter, Defendants Holden and Galloway are entitled to judgment as a matter of law with regard to all of the Plaintiff's claims against them, because the undisputed forecast of evidence shows that neither officer was involved in any events that the Plaintiffs assert give rise to their claims.

Specifically, Defendant Holden was not present at all during the Plaintiffs' arrests or transport because he had already left the scene to transport another arrestee (Hughes) to jail.

Similarly, Defendant Galloway was also absent during the events giving rise to the Plaintiffs' claims. Defendant Galloway did not arrive on the scene until some time after the fire was reported, and he merely stayed with Plaintiff Honeycutt until she was transported by another officer (Hawkins) to the detention center. Defendant Galloway was not involved in either Plaintiffs' arrest, restraint, or transport – the only events that Plaintiffs assert give rise to all of their claims. Because the undisputed forecast of evidence shows that Defendants Holden and Galloway were not at all involved in any events of which the Plaintiffs complain, all of the Plaintiffs' claims against these two Defendants fail as a matter of law.

## B. Section 1983 Claims

The Federal Civil Rights Act, 42 U.S.C. § 1983, imposes civil liability upon every person who, under color of law, deprives another of rights secured by the Constitution and laws of the United States. 42 U.S.C. § 1983. To prevail on a Section 1983 claim, the plaintiff has the burden of establishing 1) the deprivation of a right secured by the Constitution or laws of the United States, and 2) that the alleged deprivation was committed under

color of state law.  Austin v. Paramount Parks, Inc., 195 F.3d 715, 727 (4th Cir. 1999).

In the instant matter, the Defendants claim that they are entitled to judgment as a matter of law with regard to all of the Plaintiffs' Section 1983 claims for two reasons: (1) the Plaintiffs did not suffer a deprivation of any constitutional right, and (2) even if such a deprivation occurred, the Defendants are entitled to qualified immunity.  Qualified immunity protects police officers from liability for "bad guesses in gray areas" but permits aggrieved parties to seek damages when officers "transgress[ ] bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992).  Even where an officer commits a constitutional violation, that officer is still entitled to qualified immunity if, in light of clearly established law, the officer could reasonably believe his actions were lawful.  Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011).  Consequently, if an officer did not commit a constitutional violation, "the analysis ends right then and there."  Abney v. Coe, 493 F.3d 412, 415 (4th Cir. 2007).

Accordingly, taking the evidence in the light most favorable to the Plaintiffs, this Court must determine two issues: (1) did the Defendants violate the Plaintiffs' constitutional rights, and if so, (2) at the time of the violation, was the Defendants' alleged harmful conduct clearly established to

be unconstitutional.  Pearson v. Callahan, 555 U.S. 223, 227 (2009).  If either

one of these issues is answered in the negative, the Defendants are entitled

to judgment as a matter of law.

### 1.    False Arrest and False Imprisonment

Section 1983 claims for false arrest and imprisonment are properly

analyzed under the Fourth Amendment.  See Myrick v. Cooley, 91 N.C. App.

209, 212, 371 S.E.2d 492, 494 (1988) (citing Monroe v. Pape, 365 U.S. 167

(1961)).  An arrest violates the Fourth Amendment when it is made without

probable cause.  Id.  Likewise, restraint of a person who was arrested without

probable cause will give rise to a state claim for false imprisonment.  Id.

(citing Mobley v. Broome, 248 N.C. 54, 56, 102 S.E.2d 407, 409 (1958)).

Thus, probable cause to arrest defeats claims for both false arrest and false

imprisonment.  Id.

Probable cause exists when the "facts and circumstances within the

officer's knowledge . . . are sufficient to warrant a prudent person, or one of

reasonable caution, in believing, in the circumstances shown, that the

suspect has committed, is committing, or is about to commit an offense."

Michigan v. DeFillippo, 443 U.S. 31, 37 (1979).  With these principles in mind,

the legal question is whether the undisputed forecast of evidence can give

rise to a reasonable inference that the Defendants objectively lacked

probable cause to believe that the Plaintiffs had committed or were committing an offense.

In the instant case, Kitchen was arrested pursuant to a warrant, which means that Kitchen's false arrest claim fails as a matter of law.[5] See Porterfield v. Lott, 156 F.3d 563, 568 (4th Cir. 1998) ("[A] claim for false arrest may be considered only when no arrest warrant has been obtained). Kitchen's false arrest and imprisonment claims also fail because the Defendant police officers had probable cause to arrest him. The existence of an arrest warrant alone would likely lead a reasonable person to conclude that the suspect has committed an offense, but officer Farmer also heard the accounts of two eyewitnesses who observed Kitchen acting in a manner similar to and corroborative of the alleged actions giving rise to those warrants. Specifically, Kitchen, who had warrants for stalking and disorderly conduct, was seen spying in windows while carrying an axe. On these facts, Farmer clearly had probable cause to initiate Kitchen's arrest.

Honeycutt's false arrest and imprisonment claims also fail, because the officers had probable cause to arrest her as soon as she tried to interfere with Kitchen's arrest. North Carolina law prohibits any person from willfully

---

[5] Plaintiff Kitchen has made no allegation that the warrant was unsupported by probable cause.

and unlawfully resisting, delaying, or obstructing a police officer in discharging or attempting to discharge his duty.  N.C. Gen. Stat. § 14-223.  Here, Honeycutt hit the officers in the back while they tried to discharge their duties in arresting Kitchen.  Once the officers witnessed – or in this case, physically endured – Honeycutt's willful and unlawful obstruction of their efforts to arrest Kitchen, they had probable cause to arrest her.

Since probable cause was present, there was no constitutional violation in the Plaintiffs' arrests and subsequent imprisonment.  As the Court stated in Abney, 493 F.3d at 415, that ends the inquiry "right then and there," and the Court need not explore the question of qualified immunity.  The Defendants are entitled to judgment as a matter of law on these claims.

### 2. Excessive Force and Failure to Intervene

Excessive force claims in the context of an arrest are properly analyzed under the Fourth Amendment's "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 394 (U.S. 1989).  Reasonableness must be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Id. at 396.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is

necessary in a particular situation." Id. at 396-97. "The question is 'whether the totality of the circumstances justifies a particular sort of seizure.'" Id. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)).

The Defendants are entitled to judgment as a matter of law with regard to Plaintiff Honeycutt's excessive force claim. According to the undisputed forecast of evidence, while several Defendant police officers struggled on the ground with Kitchen, who was combative and yelling that he was god, Honeycutt began striking the officers on their backs with her fists. It was only then that Defendant Page withdrew from the fray to handcuff Honeycutt and seat her on the floor. The only force used against her was minimal hand restraint which was necessary to handcuff her, and later to forcibly remove her from the burning apartment while she resisted. Based upon the foregoing, this Court concludes as a matter of law that this minimal use of force was objectively reasonable. Therefore, Honeycutt's excessive force claim fails as a matter of law.

As for Plaintiff Kitchen's excessive force claim, in light of Kitchen's behavior and the chaos surrounding his arrest, it too must fail as a matter of law. The first use of force against Kitchen came when the uniformed officers attempted to arrest Kitchen on the outstanding warrants, and then only after he ignored the officers' commands to get down on the ground and show his

hands.  Any officer in that situation would be reasonable in suspecting that Kitchen may have been holding a weapon in his concealed hand.  Thus, it was objectively reasonable for the officers to wrestle Kitchen to the ground to restrain him and investigate that threat.  That Kitchen continued fighting, and managed to push himself up despite having three officers on his back, demonstrates that this level of force failed to be sufficient to subdue him, let alone excessive.

The use of pepper spray was also objectively reasonable and not excessive.  See Vinyard v. Wilson, 311 F.3d 1340, 1348 (11th Cir. 2002) ("pepper spray is a very reasonable alternative to escalating a physical struggle with an arrestee").  After the three officers were unable to physically overcome Kitchen's combativeness, Miller sprayed Kitchen's face for one to two seconds with pepper spray.  Nonetheless, before Kitchen could be handcuffed, Sinclair set the room on fire and Kitchen broke free.

The second use of pepper spray came some time later when Kitchen tried to escape after being rescued from the burning apartment.  Whitmire and Page confronted Kitchen, ordering him to get on the ground, and Kitchen responded by clenching his fists and taking a fighting stance.  Only after Kitchen continued to refuse their commands to get down on the ground did

the officers use their pepper spray.  This too was insufficient, as Kitchen then ran toward the parking lot.

A TAZER was only used against Kitchen as a last resort, and even then by someone who is not a defendant.  Kitchen ignored repeated commands to get down on the ground and to stop resisting, and he made at least two attempts at escape.  Kitchen kicked, scratched, bit, and elbowed officers while yelling things like, "I am god."  But despite the concerted efforts of four police officers over an extended period of time, and apartment in flames behind him, Kitchen simply would not surrender.  Thus, as a final resort to allow Whitmire and Page to gain control over Kitchen, ALE Agent David Miller deployed his TAZER on the Plaintiff.  Only then were the officers able to handcuff and shackle Kitchen and put him into the squad car.

In evaluating objective reasonableness, the Supreme Court instructs courts to consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396.  Here, Plaintiff Kitchen not only threatened the safety of the officers but did in fact injure them while he actively tried to evade arrest.  Nonetheless, the officers only escalated the force used against Kitchen to the extent objectively necessary and reasonable in light of

Kitchen's belligerence. Moreover, Kitchen's combativeness and several attempts to flee during the arrest amply justified Whitmire's decision carry Kitchen into the detention center rather than unshackle him and risk repeating the day's events.

Because the Defendants' use of force was objectively reasonable, there was no constitutional violation.[6] Moreover, because there was no constitutional violation, this Court need not explore the question of qualified immunity. Abney, 493 F.3d at 415. The Defendants are entitled to judgment as a matter of law on these claims.

### 3.    Deprivation of Property

For the property that was damaged or lost in the fire, the Plaintiffs assert deprivation of property without due process of law in violation of the Fourteenth Amendment. As an initial matter, an unauthorized intentional deprivation of property by a state actor is not a violation of the Fourteenth Amendment so long as a meaningful post-deprivation remedy is available. Hudson v. Palmer, 468 U.S. 517, 533 (1984). In this case, an adequate remedy is available to the plaintiff by way of an action for conversion in state court. Therefore, this claim fails as a matter of law. Moreover, the

_____

[6] This determination is also fatal to Kitchen's failure to intervene claim, because that claim requires the observation of unconstitutional conduct. As outlined *supra*, the Plaintiffs have failed to present a forecast of evidence as to any such unconstitutional conduct.

undisputed forecast of evidence shows that it was Natasha Sinclair who caused the fire which resulted in the destruction of property. Thus, for this reason too, Plaintiffs' deprivation of property claim fails as a matter of law.

    4.    Failure to Train

The Plaintiffs also assert failure to train claims against the City of Brevard, Chief Harris, Transylvania County, and Sheriff Mahoney. In <u>Monell v. Department of Social Services</u>, 436 U.S. 658, 690 (1978), the Supreme Court held that municipalities and other local governmental entities are "persons" within the meaning of § 1983. However, municipal liability will not lie solely on a theory of *respondeat superior*. <u>Monell</u>, 436 U.S. at 691. Rather, a municipality may be liable under § 1983 only when the municipality "causes the deprivation 'through an official policy or custom.'" <u>Lytle v. Doyle</u>, 326 F.3d 463, 471 (4th Cir. 2003) (quoting in part <u>Carter v. Morris</u>, 164 F.3d 215, 218 (4th Cir. 1999)). It is axiomatic, therefore, that if there is no constitutional deprivation, there can be no municipal liability. <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986).

In the instant case, this Court has concluded that the Plaintiffs have suffered no constitutional deprivation. The Plaintiffs' Fourth Amendment rights were not violated because the officers used objectively reasonable force in effecting the arrests, and the arrests were supported by probable

cause.  The Plaintiffs' Fourteenth Amendment rights were not violated when the Plaintiffs' lost property in a fire that was started by an occupant in the Plaintiffs' residence.  Because there has been no constitutional deprivation by the individual police officers or deputies, there can be no municipal liability for those who purportedly failed to train them.  See Heller, 475 U.S. at 799. Accordingly, all of the Plaintiffs' Section 1983 claims fail as a matter of law.

### C.    State Law Claims

#### 1.    Assault and Battery

A civil action for assault and battery is available under North Carolina law against one who uses force for the accomplishment of a legitimate purpose (such as a justifiable arrest), but only if the force used is excessive under the circumstances.  Myrick, 91 N.C. App. at 215, 371 S.E.2d at 496. "The question of '[w]hether an officer has used excessive force is judged by a standard of objective reasonableness.'"  Jordan v. Civil Service Bd., 153 N.C. App. 691, 698, 570 S.E.2d 912, 918 (2002) (quoting Clem v. Corbeau, 284 F.3d 543, 550 (4th Cir. 2002).

Here, the Plaintiffs' assault and battery claims are resolved by this Court's previous determination in the context of Plaintiffs' Section 1983 claims that the Defendants' use of force was objectively reasonable.  In light

of this determination, the assault and battery claims too must fail as a matter of law.  See Myrick, 91 N.C. App. at 215, 371 S.E.2d at 496.

    2. Negligent or Intentional Infliction of Emotional Distress

The Plaintiffs also allege state law claims for the negligent or intentional infliction of emotional distress.  Essential to the viability of these claims, however, is a forecast of evidence that the Defendants are guilty of some wrongdoing, either negligent, see Thomas v. Weddle, 167 N.C. App. 283, 290, 605 S.E.2d 244, 249 (2004), or extreme and outrageous, see Dickens v. Puryear, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981).  This Court having previously determined from the undisputed forecast of evidence that the Defendants' conduct was objectively reasonable, these claims must also fail as a matter of law.

## V. CONCLUSION

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 67] is **GRANTED** and all of the Plaintiffs' claims are hereby **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the Defendants' Motion to Dismiss for Failure to Prosecute [Doc. 60] is **DENIED** as moot.

**IT IS SO ORDERED.**

Signed: December 29, 2016

Martin Reidinger
United States District Judge